834 So.2d 974 (2002)
STATE of Louisiana
v.
Donald S. WRIGHT.
No. 2001-KA-0322.
Supreme Court of Louisiana.
December 4, 2002.
Rehearing Denied February 7, 2003.
*977 Marcia A. Widder, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, James M. Bullers, District Attorney, Jason T. Brown, Carl L. Ekendahl, Bossier, John S. Marvin, C. Sherburne Sentell, III, Minden, Louis C. Minifield, Counsel for Respondent.
*978 VICTORY, J.
On January 14, 2000, a Webster Parish grand jury indicted defendant, Donald S. Wright, for first degree murder in violation of La. R.S. 14:30. On the same day, the state filed its notice of intent to seek the death penalty. On March 20, 2000, defendant filed a motion for a change of venue, which the court granted after conducting a hearing on the matter on April 10, 2000, transferring the case to Lafayette Parish. On May 5, 2000, the state submitted defendant's case to a newly impaneled grand jury, which reindicted defendant for first degree murder. After a trial by jury, defendant was found guilty as charged on August 25, 2000. Two days later at the close of the penalty phase of the trial, the jury unanimously returned a verdict of death finding the aggravating circumstances that: (1) defendant was engaged in the perpetration or attempted perpetration of an aggravated or forcible rape; (2) the victim was under the age of 12 years; and (3) the offense was committed in an especially heinous, atrocious or cruel manner. Defendant now appeals his conviction and sentence, raising 46 assignments of error, variously combined into 21 arguments.[1]

Facts
At approximately 4:00 or 5:00 p.m. on December 12, 1999, defendant, his live-in girlfriend, Lora Moseley, and Moseley's six-year-old daughter, Heather White, went to the Dairy Queen on Pines Road in Shreveport. Cindy Williams, a Dairy Queen employee, noticed the little girl and thought she had cancer as she appeared "really sickly" and had a shaved head. As the three prepared to leave the restaurant, Williams heard the girl fall to the floor and then defendant say that she had suffered a seizure. Defendant picked the child up and Williams asked the group if they wanted her to call 911 for them. Defendant responded that he did not.
Detective Angela Cropper testified that the dispatcher from the Webster Parish Sheriff's Office called her on the evening of December 12, 1999. The detective learned that Bayou Ambulance had picked up a small child in cardiac arrest and that child abuse was suspected. When she saw the child at Minden Medical Center, which she thought was a little boy on account of her crewcut, she observed bruises around her face. The victim was still alive at the time but was on life support. Det. Cropper identified a number of photographs depicting bruises to various areas of the victim's body. She further described the victim as "very, very thin...." The victim was transported to LSU Medical Center in Shreveport, where she died three days later, after being taken off life support.
Given the child's condition, the authorities immediately suspected child abuse and defendant and Lora Moseley were both transported to the Webster Parish Sheriff's Office for questioning. After both voluntarily gave statements to the authorities, they were arrested and charged with cruelty to a juvenile.[2]
Defendant gave two statements to the police: the first following his arrest just before midnight on December 12, 1999, and the second the following morning, after officers had searched the trailer he shared with Lora Moseley and the victim.
In the first statement, defendant gave a rambling narrative describing the events that transpired between the time that the victim regained consciousness following *979 her fall at the Dairy Queen and the time she was observed by Detective Angela Cropper. Defendant claimed that both he and Lora Moseley disciplined the child and that the punishments grew increasingly severe as the victim failed to comply with their demands. Defendant claimed that "he initially beat the victim with his hands, and later with a leather strap, and finally with a wooden board. Defendant discussed an instance in which he placed his forearm to the victim's neck so that she would look at him. However, when asked about the injuries to the victim's head, defendant claimed that she had sustained them from falls. Defendant denied striking the child about the head, stating, "I'm five times stronger than she is ..." and "I'm too big for her."
He claimed that the victim's mother was with him at all times when he supervised the child except for one night when she went to work. During the interrogation, the officer pressed defendant about the victim's injuries, asking him, "What about all the rest of the bruises and I mean, you just said yourself, you're there twenty-four hours a day with the girl." Defendant tacitly admitted as much, responding, "Just like her mother is ... just like Lora is."[3] Nonetheless, defendant maintained in the first statement that he did not resist seeking medical attention earlier because he feared that the abuse would be discovered. Finally, defendant claimed that he had discarded the leather gun strap he had used to "discipline" the child.
In the second statement, taken the following morning, officers confronted defendant with photographs depicting specific wounds to the victim's body. Defendant admitted that he caused the bruises appearing on her buttocks and the missing "chunk of flesh" there by spanking her with his hand. However, he then stated that Lora would also administer spankings to the victim with both her hand and the pine board. He then identified a wound on the victim's right hip as coming from a beating he had administered with the gun strap. Defendant also admitted that blood found on the board which the officers had seized from the kitchen of the residence probably came from the victim. Defendant stated he would normally administer the spankings in either the kitchen or the victim's bedroom. When asked about blood splattered on the wall of the victim's bedroom, defendant claimed that it was his blood, originating from a nose bleed he had sustained "a while back." In this second statement, defendant admitted that he did not seek out medical attention for the victim's seizures earlier because of the visible injuries she had sustained through his means of discipline. Defendant also admitted shaving the victim's head, claiming he had done so with the child's approval after she had attempted to cut her own hair which left uneven "patches all over her head."[4] As in the first statement, defendant claimed that he administered the beatings to discipline the child for telling lies.[5] Finally, he stated that the victim *980 had lived with her mother and him continuously for the past three or four months.
Dr. Stephen Cogswell performed the autopsy on the victim's body a day after her death. He described the victim as "very thin" and noted that her hair had been cut extremely short, approximately 1/8 of an inch in length. The witness described observing external injuries primarily along the victim's back, buttocks, face and head area, and her legs. A majority of the injuries to the victim's head and neck area were relatively fresh but there were older contusions as well. Cogswell specified that he noted contusions on both of her temple areas, a contusion on the side of her face, contusions on her chin and jaw line and contusions around the base of her neck, both on the front on the left side and also below her left ear. When describing the wounds to the victim's buttocks and legs, Cogswell described "a large concentration of overlaying injury." He stated that the wounds could not heal because they were continuously re-injured.
When questioned about the injuries to the victim's head and neck, Cogswell stated that the bruise on the front of her neck was consistent with someone pinning her up against a wall with a forearm. However, when asked about the head injury which bruised the brain and caused the victim's death, the witness stated that:
... the injury to her brain is a significant, severe injury. This is not trivial. It's not what you get from a bump on the head or a fall off of a bench here or even a fall off a swing set. This is severe injury more along the lines of what you see in falls from a fairly significant height like 10 feet or so or severe beatings or even car wrecks. These are the sort of injuries we're talking about. It takes a significant amount of force to bruise your brain. Your brain is protected inside the helmet of bone, the skull, and aside from infants who, obviously, have very soft skulls, etcetera, our brains are pretty resistant to being injured. So, in order to bruise a brain and to actually tear a brain like that requires a significant amount of force, so it's more than just a bump against the wall.
When asked what caused the victim's death, Cogswell replied, "Her cause of death is basically child abuse. The head injury is the final step in the blunt force injuries. The head and brain injury is what ultimately caused her death." The doctor added that the victim's immune system had been damaged by the repeated *981 abuse and that she could not heal as would a normal child. The state then introduced the autopsy report into evidence, which listed child abuse as the cause of death.
On cross-examination, Cogswell elaborated on the injury that caused the victim's death, stating that it was likely sustained two to six hours before the victim lapsed into a coma and that her fall at the Dairy Queen was most likely a consequence of the brain swelling rather than its cause. Finally, the doctor opined that although the repetitive injuries to the victim's body weakened her immune system, she would have survived the injuries to her buttocks, arms, legs and back in the absence of the trauma to her head.[6]
In addition to defendant's statements in which he admitted beating the victim, the state introduced considerable scientific evidence corroborating the extent of the abuse.
Lieutenant Steve Cropper, an employee of the Webster Parish Sheriff's Department, testified about evidence he collected when conducting a search of the trailer that defendant shared with Lora Moseley and the victim.[7] The witness stated that the search yielded a leather gun sling, numerous pairs of child's panties with what appeared to be blood stains, and drops of blood spattered over numerous walls inside the victim's bedroom. The state also introduced photographs taken inside the trailer depicting the blood spatters. The officer began counting the blood spatters on the wall but stopped when he reached 2,000. Lieutenant Cropper also testified that when he and the other officers conducting the search lifted the eggshell-type mattress that the victim was using as a bed, they discovered bloody underwear and paper towels that the victim had apparently been using to stop the bleeding. Photographs of the bloody underwear and paper towels, as well as other scenes from the trailer, were introduced into evidence. Given that the underwear was made for a child and Lora Moseley weighed approximately 250 pounds, the underwear obviously belonged to the victim. The officer also identified the bloody gun sling recovered at the residence and a Venetian blind with blood spatters. Finally, Lieutenant Cropper identified broken pieces of a board recovered from a trash can at the residence stained with what appeared to be blood.
The court qualified Bruce Stentz, an employee of the Northwest Louisiana Crime Lab, as an expert in the field of blood stain pattern interpretation. The witness testified that he collected eight blood stains from different areas in an effort to get a representative and random sample of the blood spattered throughout the trailer. Stentz further testified that based on the size and pattern of the blood drops found on the various surfaces, it qualified as "medium velocity impact spatter." The officer continued that such spatter is consistent with the type of force generated in a beating or a stabbing.
Michelle Gaines, also employed by the Northwest Louisiana Crime Lab, qualified as an expert in DNA analysis. Gaines compared the DNA profile of the blood collected by Stentz with DNA profiles of blood collected from defendant, Lora Moseley and the victim. Based on her *982 analysis, the expert testified that the chances that the blood originated from a Caucasian individual other than the victim was one in 5.8 trillion. Gaines similarly testified that blood matching the victim's DNA profile was found on the leather gun strap and the two wooden boards seized from the home.
Finally, the state introduced evidence of motive: defendant's apparent hatred of the little girl, whom he blamed for her mother's miscarriage. Defendant's landlord testified that defendant told him that Heather was "out of control" and that the stress resulting from her behavior caused Lora Moseley's miscarriage. The state also introduced a handwritten note found in the garbage at the trailer that defendant had apparently written to his girlfriend concerning the miscarriage which read, "Thanks to Heather, who is a pain, liar, self-centered brat 24/7 all the time. Because of Heather. I blame her for this!!!" In another apparent communication to Lora Moseley found in the trailer, defendant wrote, "There's no remorse in her face or in her eyes at all, so why is she acting like this? Maybe ... you should have a heart to heart with the little bastard of yours."

DISCUSSION
A. Guilt Phase Errors
1. The state presented insufficient evidence to sustain the jury's first degree murder verdict. (Assignments or error nos. 1-2).
In his first argument, defendant claims that state introduced insufficient evidence to sustain the verdict. In the first portion of the argument, he alleges that the evidence did not prove he inflicted the injuries causing the victim's death or that he acted as a principal to the offense.
"In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).... [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Captville, 448 So.2d 676, 678 (La.1984).
La. R.S. 14:30(A) provides in relevant part:
First degree murder is the killing of a human being
(1) [w]hen the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... aggravated rape [or] forcible rape;
* * *
(5) [w]hen the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is under the age of twelve.
Defendant claims that, given the lack of evidence that he inflicted the blows that ultimately killed the victim, the state presented insufficient evidence to convict. The state concedes that it did not present evidence conclusively demonstrating that defendant struck the victim in the head but claims that, given the evidence that he brutally beat her and was with her constantly during the last days of her life, the jurors properly found that he acted as a principal to the offense.
Under Louisiana law, a person may be convicted of intentional murder even if he has not personally struck the fatal blows. La. R.S. 14:24. State v. Anthony, *983 98-0406, p. 14 (La.4/11/00), 776 So.2d 376, 386, cert. denied, 531 U.S. 934, 121 S.Ct. 320, 148 L.Ed.2d 258 (2000) "( [E]ven without establishing that defendant was the triggerman, his conviction is valid because he was involved in this felony murder and he intended, from the outset, to kill their victims.") A defendant, however, may be convicted as a principal only for those crimes for which he has the requisite mental state. State v. Brooks, 505 So.2d 714, 717 (La.1987), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). Only those persons who knowingly participate in the planning or execution of a crime may be said to be "concerned" in its commission, thus making them liable as principals. State v. Knowles, 392 So.2d 651 (La.1980).
This Court's murder cases requiring specific intent show that more than mere presence and subsequent flight from the scene is required to be found guilty as a principal. See e.g., State v. Brooks, supra (defendant facilitated rape and murder by holding victim while co-defendant undressed him, defendant also gagged boy and took him to the murder site, defendant's "presence and assistance" allowed jurors to conclude he acquiesced in the use of deadly force); State v. Holmes, 388 So.2d 722 (La.1980) (defendant convicted of first degree murder committed during armed robbery when accomplice shot victim because evidence showed defendant helped plan robbery, obtained shotgun, disarmed security guard, and threatened to kill customers, all showing his intent to use deadly force in effectuating the robbery); State v. Sonnier, 380 So.2d 1 (La. 1979) (Court affirmed first degree murder conviction as principal when defendant and his brother came upon a couple and his brother handcuffed the couple; then both men raped the girl and his brother shot the couple while the defendant held the flashlight on them).
In this case, defendant's own statements demonstrate that he repeatedly struck the child about the buttocks and legs using his hands, a gun strap and a wooden board. While the state introduced no direct evidence demonstrating exactly how the victim incurred the head injuries, the jurors concluded that they were sustained though beatings instilled by either defendant or the victim's mother and that defendant actively intended to kill the victim or to inflict great bodily harm.
An examination of child abuse murder cases from other jurisdictions suggests that courts have split on the issue whether evidence of prolonged brutal torture and abuse suffices to prove a specific intent to kill or inflict great bodily harm. Several courts have found that in cases in which the victim's injuries are particularly gruesome, intent may be inferred from the circumstances. See People v. Mincey, 2 Cal.4th 408, 6 Cal.Rptr.2d 822, 827 P.2d 388 (1992), cert. denied, 506 U.S. 1014, 113 S.Ct. 637, 121 L.Ed.2d 567 (1992) (evidence sufficient to support first degree murder conviction; five-year-old son of defendant's girlfriend had hundreds of injuries, some of which caused his intestines to stop working and others caused his brain to swell); People v. Oaks, 169 Ill.2d 409, 215 Ill.Dec. 188, 662 N.E.2d 1328 (1996), cert. denied, 519 U.S. 873, 117 S.Ct. 191, 136 L.Ed.2d 129 (1996) (evidence sufficient to sustain first degree murder conviction; three-year-old son of defendant's girlfriend died from massive head injuries and had numerous other injuries); State v. Rowell, 256 Kan. 200, 883 P.2d 1184 (1994) (evidence sufficient to sustain first degree murder conviction; 16-month-old daughter died of injuries to internal organs after being subjected to long period of abuse).
*984 Nevada courts, for instance, have consistently upheld first degree murder convictions for the death of children by battering. In Hern v. State, 97 Nev. 529, 635 P.2d 278 (1981), the Nevada Supreme Court affirmed such a conviction in a case in which the defendant beat to death the three-year-old son of his girlfriend.[8] The court found "it was permissible for the jury to find that Hern formed an intent to kill through extreme physical abuse, and that appellant caused the death with premeditation." Id. at 279. To hold otherwise, the court concluded, "a first degree murder conviction would be most difficult, if not impossible, to obtain if the victim is a child who has not been killed with a gun or other dangerous weaponbut severely beaten, as in the instant case." Id.
Other courts, however, have refused to find a premeditated intent to kill and lowered jury convictions for first degree murder to second degree murder and manslaughter. See e.g., Massie v. State, 553 P.2d 186, 190 (Okla.Crim.App.1976) (court held evidence that four-year-old had numerous injuries and died of head injuries insufficient to support murder committed with a "premeditated intent and design to effect the death" of the victim); State v. Brown, 836 S.W.2d 530, 537 (Tenn.1992) (defendant's infliction of massive head injuries, multiple internal injuries, an untreated broken bone, bruises to his genitals and extremities and numerous other injuries insufficient to sustain first degree murder conviction because evidence failed to prove premeditation and deliberation).
In Midgett v. State, 292 Ark. 278, 729 S.W.2d 410 (1987), the defendant brutally beat his eight-year-old son, ultimately killing him with blows to the abdomen and chest. The court reduced the defendant's conviction from first degree murder to second degree murder, finding that:
The evidence in this case supports only the conclusion that the appellant intended not to kill his son but to further abuse him or that his intent, if it was to kill the child, was developed in a drunken, heated, rage while disciplining the child. Neither of those supports a finding of premeditation or deliberation. Id. at 414. (Emphasis added).
Importantly, in Louisiana, unlike in most jurisdictions, premeditation and deliberation are not required to support a verdict of first degree murder. Rather, Louisiana requires only specific intent, which may be formed in an instant, rather than premeditation, which denotes advance planning. As a result, jurors were not required to find that defendant planned killing the victim in advance but rather only that he possessed the specific intent to kill or to inflict great bodily harm immediately before she sustained the blows that killed her. La. R.S. 14:30.
Ultimately, we agree that the jurors had sufficient evidence to conclude that defendant possessed such intent. When interrogated by police, defendant admitted to spending "twenty-four hours a day" with the child. Accordingly, jurors thus rationally concluded that defendant was present when the victim sustained the injuries that caused her death. Defendant also admitted to brutally beating the victim *985 innumerable times as his method of punishment. The evidence at trial, including the 2,000 plus blood spatters on the walls of the trailer and the multiple sets of bloody children's underwear found beneath the victim's bed, the gun strap and the wooden board both containing the victim's blood, the fact that defendant hid the gun strap and lied about the source of the blood stains on the wall, the motive presented at trial that defendant blamed the victim for Lora Moseley's miscarriage, the photographs of the victim showing the severe extent of her multiple injuries, and evidence that the victim suffered recent sexual abuse overwhelmingly established the systematic use over time of grossly disproportionate corporeal punishment under circumstances giving rise ineluctably to the inference that defendant acted with the specific intent to kill or inflict great bodily harm.
At the very least, the evidence proves that the defendant and Moseley, assuming Moseley joined in the abuse, either directly or indirectly encouraged each other in a course of conduct involving homicidal risk because it resulted in grievous bodily injury to the victim.[9]State v. Anderson, 97-1301, p. 3 (La.2/6/98), 707 So.2d 1223, 1224 ("Acting in concert, each man then became responsible not only for his own acts but for the acts of the other."). As a result, although this case does not resemble others in which this Court has affirmed first degree murder convictions in which the defendant has acted as a principal to the offense, see Brooks; Holmes; Sonnier, supra, the evidence sufficed to prove defendant, at the very least, acted as a principal to the offense.[10] As a result, this portion of defendant's assignment concerning the sufficiency of the evidence lacks merit.
Defendant next argues that the state failed to prove that the offense occurred during the perpetration or attempted perpetration of an aggravated or forcible rape. The argument is twofold in that defendant claims that the state failed to demonstrate both: (1) the existence of a rape or attempted rape contemporaneous to the offense; and (2) that he was the perpetrator of the requisite underlying felony.
The state presented considerable evidence demonstrating that the victim had suffered horrific sexual abuse before her death. Dr. Cogswell, who performed the autopsy, noted the presence of a "very deep" bruise on the outer lip of the victim's vaginal area. The witness also found a small abrasion on one of the inner lips of the victim's vagina, which he described as "very new."[11] Cogswell also testified about two tears to the victim's anus. The doctor stated that he examined sections of *986 the areas and found deep bruising, not only fresh, but old, which indicated a period of sustained reinjury to those areas. Regarding the new injuries, Cogswell stated that they could have been inflicted anywhere from a few days to a few hours before the victim's death. These injuries were "consistent with being penetrated by something anally."
Dr. Ann Springer, a pediatrician at the LSU Medical Center in Shreveport, qualified as an expert in the physical and sexual abuse of children and also testified about the victim's injuries resulting from sexual abuse. Springer examined the victim while she was on life support in the pediatric intensive care unit at the LSU Medical Center. When Springer examined the victim's vaginal and rectal areas, she noted the presence of bleeding and bruising around her hymen. The opening of the victim's anus had "deep" tears in various directions, which radiated out from the center. Like Cogswell, Springer stated that the bruising to the victim's hymen could have been caused by her being catheterized. However, the doctor stated that the fissuring of the anus had been the result of "traumatic penetration." Springer elaborated, stating that "some object that was sufficiently rigid and big enough to be thrust in this opening and was too big to fit, basically forced its way into the opening and tore it causing the injuries I described." Based on her examination, Springer opined that the victim had been penetrated several times but stated the most recent tears were freshly bleeding, suggesting that they had been sustained within hours of the time the victim lost consciousness.
While this strongly suggests that defendant sexually assaulted the victim, we cannot say that the state successfully proved beyond a reasonable doubt that the murder took place during the perpetration or attempted perpetration of an aggravated or forcible rape. Dr. Springer admitted that she could not identify the object that penetrated the child, responding affirmatively when asked whether it could have been "a finger, thumb, broomstick, mop handle stick ... [or] male penis." As in this case, other cases suggest that medical experts are unable to determine anything more than that vaginal and anal wounds are "consistent with" having been caused by a penis. For instance, in Strawderman v. Commonwealth, 200 Va. 855, 108 S.E.2d 376 (1959), the Virginia Supreme Court reversed the defendant's rape conviction finding insufficient evidence that the victim's injuries had been caused by his penis. The Court found that despite the state physician's testimony to the contrary, "it is a matter of common knowledge, notwithstanding the doctor's statement, that the injuries described could have been caused by means other than the one related. Dr. Hertzler's statement as to the cause of the injury to the child was, of necessity, pure speculation and guess." Id. at 380; Cf. John McCann, The Appearance of Abuse, Healing and Healed Anogenital Trauma, 22 Child Abuse & Neglect, 605, 610-11 (1998) ("The interpretation of perianal finding in children ... suspected of having been sexually abused is difficult ... Some of the more frequently asked questions are.... Is it possible to tell the size of the object used during the assault and the amount of force applied from physical findings alone?").
In its appellate brief, the state all but concedes that it failed to present constitutionally sufficient evidence that defendant murdered the victim during the perpetration or attempted perpetration of an aggravated or forcible rape, claiming that defendant's argument to that effect, "completely ignores the fact that the elements *987 of first degree murder are satisfied if the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is under the age of 12."[12]
In Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), the Supreme Court held that when a jury's general verdict could have rested on a constitutionally invalid basis as well as a valid basis, and the reviewing court cannot determine which basis led to the verdict, under an instruction that either ground may independently support the verdict, the defendant's conviction must be set aside.[13] However, in Griffin v. U.S., the Court held that the holding of Stromberg did not require a guilty verdict to be set aside when one of the possible bases of a conviction was not constitutionally invalid, but was merely unsupported by sufficient evidence. 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1992) (citing Turner v. U.S., 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970)).
Further, unlike Stromberg, in this case, the Court can ascertain the grounds upon which the jury convicted defendant of first degree murder given that jurors unanimously found both of the two aggravating factors at sentencing which the state relied upon during the guilt phase of the trial.[14] Therefore, the jurors most assuredly relied on the victim's age when it found defendant guilty of first degree murder. In fact, the parties stipulated that the victim's date of birth was December 23, 1992, and that she died on December 15, 1999. That being the case, the state's failure to present constitutionally sufficient evidence that the victim was killed during the course of an aggravated or attempted aggravated rape does not warrant reversal of the conviction. Accordingly, this portion of defendant's claim concerning the sufficiency of the evidence does not warrant intervention.
*988 B. Penalty Phase Errors
1. The death sentence imposed in this case was the product of passion, prejudice and arbitrary factors arising from the introduction of inadmissible and inflammatory testimony of state witnesses. (Assignments nos. 5-14).
Defendant alleges that admission of various penalty phase testimony provided by his ex-wife interjected arbitrary factors into the jury's sentencing determination and rendered its death verdict unreliable.
Defense counsel did not object to any of the allegedly inadmissible testimony and as a result, defendant waived any appellate claim based on its alleged inadmissibility. La.C.Cr.P. art. 841; State v. Wessinger, 98-1234, p. 20 (La.5/28/99), 736 So.2d 162, 180-81, cert. denied, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999) (reviving the contemporaneous objection rule for the penalty phase, as well as guilt phase of a capital trial).[15] Nonetheless, a review of the evidence follows to determine whether it interjected arbitrary factors into the jury's deliberations at the penalty phase of the proceedings, an inquiry left open by the Court in Wessinger as a matter of its Rule 28 review in capital cases wholly apart from the normal procedural default rules governing trial of any case, including a capital one. Wessinger, 736 So.2d at 181 ("In the event that an error that warranted reversal was not objected to contemporaneously in the trial court, that error will be discovered during our mandatory direct review [under Rule 28].").
Defendant complains about testimony elicited from his ex-wife, Christy Young. First, defendant alleges that evidence demonstrating that he abused Young during their marriage should not have been admitted. A review of the witness's testimony reveals that she claimed that during their marriage, defendant knocked her tooth out when he slapped her across the face. She also testified generally about other "sporadic" instances of domestic abuse occurring every "couple of months." The witness also stated that after the couple moved to Louisiana in 1996, defendant, "had already been put in jail in California for abuse."
Next, defendant complains about testimony provided by Young suggesting that he physically and sexually abused his own children. Regarding the alleged abuse, the record reveals that Young testified that her "oldest son ended up in a mental hospital for abuse and possible molestation." As a result, defendant lost his visitation rights. The witness claimed that she was "sure" that it was defendant who "abused or molested" her son and that both of their children were "going to counseling as a result of abuse from their dad."
Finally, defendant claims that the witness should not have testified about an alleged confession made to her concerning the instant offense. Specifically, Young stated that she spoke to defendant the day after he was arrested and asked him, "if he did this. And he said, yes, he did."
On cross, defense counsel confronted Young with six letters that she had written defendant while he was incarcerated on the instant charge. Defense counsel apparently attempted to cast doubt on the veracity of Young's testimony by introducing *989 the letters which suggest that defendant's children (and to some extent Young herself) harbored no ill will towards him.[16] Counsel also attempted to suggest that Young's testimony was motivated by a desire to prevent her children from seeing defendant's family.
La.C.Cr.P. art. 905.2 provides that "[t]he sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the impact that the death of the victim has had on family members." Rules governing the admission in penalty phase hearings of unrelated and unadjudicated crimes evidence to prove the defendant's character and propensities have evolved jurisprudentially. In State v. Brooks, supra, this Court approved the state's introduction in its case-in-chief in the penalty phase of two unrelated and unadjudicated murders once the trial judge determined that: (1) the evidence of the defendant's commission of the unrelated criminal conduct is clear and convincing; (2) the proffered evidence is otherwise competent and reliable; and (3) the unrelated conduct has relevance and substantial probative value as to the defendant's character and propensities. Brooks, 541 So.2d at 814. In State v. Jackson, 608 So.2d 949 (La.1992), the Court granted pre-trial writs to establish limitations on the admissibility of unrelated and unadjudicated criminal conduct in capital sentencing hearings.[17] There, the Court ruled that evidence of the unadjudicated criminal conduct must involve violence against the person of the victim for which the period of limitation for instituting prosecution had not run at the time of the indictment of the accused for capital murder. Jackson, 608 So.2d at 955. More recently, in State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, 21, cert. denied, 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998) this Court noted:
At the outset, it is important to note that the judge, and not the jury, determines the admissibility of the evidence of unrelated criminal conduct by determining whether the defendant's commission of the criminal conduct was proved by clear and convincing evidence and whether the unrelated conduct has relevance and substantial probative value as to the defendant's character and propensities.
In this case, even assuming that the state failed to demonstrate that the vague offenses referred to by Young were crimes of violence for which the period of instituting prosecution had not run when the grand jury indicted him for the instant offense, any error in this regard does not require reversal of defendant's conviction. In the context of Rule 28, an arbitrary *990 factor is not simply an error which might have had some bearing on the jury's sentencing verdict but an error of such magnitude that it undermines confidence in the jury's sentencing verdict, essentially the same kind of error that would support the prejudice prong under Strickland for claims of ineffective assistance of counsel. See State v. Thibodeaux, 98-1673, pp. 14-15 (La.9/8/99), 750 So.2d 916, 928, cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000).
In this case, Young's testimony that defendant physically abused her and her sons, and her claim concerning his "confession" did not undermine confidence in the verdict. Given the horrific details of child abuse related by the witnesses at the guilt phase, evidence demonstrating that defendant hit his first wife on occasion would not likely influence jurors to vote for death. Similarly, Young's opinion that defendant had abused or molested one of her sons would not arbitrarily influence the jury to vote for death. Finally, given the very vague nature of the testimony indicating defendant admitted committing the instant offense to his ex-wife, it is extremely unlikely that it had any effect on any residual doubt possessed by jurors, especially considering the state's argument that he acted, at the very least, as a principal to the offense.[18] Notably, at the time of the alleged confession, the victim was still alive and the state had only charged defendant with cruelty to juveniles, thus defendant was not confessing to the first degree murder of the six-year-old victim. This assignment of error lacks merit.

SENTENCE REVIEW
Under La.C.Cr.P. art. 905.9 and La.S.Ct.R. 28, this Court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under influence of passion, prejudice, or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The district judge has submitted a Uniform Capital Sentence Report (UCSR) and Capital Sentence Investigation Report (CSI) as La.S.Ct.R. 28 § 3(b) requires. In addition, the defense has filed an opposition to the UCSR.
These documents reveal that defendant, Donald Wright, was 31 years old at the time of the crime. He was born in California to Laura Arnold Howe and James Wheaton Howe but stated that his father left when he was one year old. His stepfather, Arland Gary Wright adopted him at the age of five. He graduated from high school and attended a vocational college for approximately one year where he studied automotive repair and weight training. Before graduating high school, defendant spent some time in group homes due to behavior problems. His IQ was measured at 94, in the medium range.
Defendant has no prior juvenile or adult felony convictions but was charged with inflicting corporal injury to a spouse or cohabitant in 1995 in San Diego. Defendant admitted to spending three days in jail but stated that the charges were later dropped. He has no recorded criminal history suggesting involvement in sex-related *991 offenses. However, the psychological evaluation prepared by Dr. Sentell, which was not admitted into evidence but was attached to the opposition to the CSI and referred to by Dr. Sentell in his testimony, indicates that he was previously investigated "by child protection for alleged physical and sexual abuse of his two boys by a previous marriage." Defendant is divorced from the children's mother, Christy Young, who testified for the state at the penalty phase. He claimed that he had partial custody of the two children until his present incarceration. However, it does not appear that he was otherwise contributing to their support at the time of the offense. No evidence suggests that defendant was under the influence of drugs or alcohol at the time of the offense or that he had a substance abuse problem.
Defendant reported that his employment history began when he helped his stepfather build his parents' dream house. During this three-year project, defendant learned to drywall and do electrical wiring. Defendant also worked for a picture framing company for less than one year making frames. Defendant next reported employment with a company that made fiberglass tools for two years. He then moved to Arizona and worked for a temporary service, making candles. He then returned to California and worked for a water purification plant. He also reported odd jobs operating forklifts. When the family moved to Louisiana, defendant worked installing carports for one and one half years. He quit this job and went to work at Southern Components for about two years. He then quit that job and worked off and on for Domino's Pizza. He then returned to Southern Components for about six months.
Defendant then reported going to truck driving academy and driving for USA Trucking for about four months and then quitting. He then claimed that he secured employment with Warner Trucking but that they ultimately did not hire him because he had not fulfilled his contract with USA Trucking. It does not appear that defendant was employed at the time of the offense.
The Capital Sentence Report also contains a statement made by defendant concerning the offense in which he largely places the blame for the child's death on her mother. In addition, he denies sexually assaulting the victim.[19]
*992 PASSION, PREJUDICE, OR OTHER ARBITRARY FACTORS
The record reveals no indicia of passion, prejudice or arbitrariness. Race was not a factor in the proceedings. Defendant, the victim and all twelve jurors were Caucasian. In addition, as a result of widespread media coverage, the court granted a change of venue and the case was tried in Lafayette Parish.
AGGRAVATING CIRCUMSTANCES
The state presented sufficient evidence to demonstrate the aggravating circumstances that the victim was under the age of 12 years and that the offense was committed in an especially heinous, atrocious or cruel manner. Jackson v. Virginia, supra. While the jury also found that the offense occurred during the perpetration or attempted perpetration of an aggravated or forcible rape, the state presented constitutionally insufficient evidence to support the aggravating circumstance. Nonetheless, the state's failure to present sufficient evidence to prove the underlying felony does not warrant the Court's intervention. State v. Martin, supra at 201; State v. Deboue, supra at 368; State v. Byrne, supra (The failure of one statutory aggravating circumstance found by the jury to support a death sentence does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings).
PROPORTIONALITY REVIEW
Although the federal Constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991); State v. Wille, 559 So.2d 1321 (La.1990); State v. Thompson, 516 So.2d 349 (La.1987), cert. denied, 488 *993 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). This Court, however, has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, supra at 9; see also State v. Weiland, 505 So.2d 702, 707-10 (La.1987) (in case reversed on other grounds, dictum suggesting that death penalty disproportionate).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, supra.
Since January 1, 1976, there have been at least 15 other successful prosecutions for first degree murder in the 26th Judicial District Court (which is comprised of Bossier and Webster Parishes) involving the present statutory scheme.[20] Of these 15 cases, six resulted in the imposition of the death penalty, five were affirmed by this Court, and one resulted in the annulment of the death penalty and the imposition of a life sentence.[21]
*994 A review of the capital verdicts from Bossier and Webster Parishes does not suggest that defendant received a disproportionately harsh sentence. Nonetheless, given the scarcity of factually similar cases from the 26th Judicial District, it is appropriate for this Court to look beyond the judicial district in which the sentence was imposed and conduct the proportionality review on a state-wide basis. State v. Davis, 92-1623, pp. 34-35 (La.5/23/94), 637 So.2d 1012, 1030-1031, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). As discussed above, in defendant's brief, he has attached an appendix summarizing 36 cases in which appellate courts have affirmed convictions and sentences in cases arising from the death of a child under 12 during the course of domestic child abuse. The sentences in these cases *995 range from seven years imprisonment at hard labor to life imprisonment "without benefit." However, despite defendant's claims to the contrary, a state-wide review of cases reflects that jurors often find the death penalty appropriate in cases in which the victim is a young child.[22] The majority of these offenses involve the commission aggravated rape, or another enumerated felony, i.e., Deboue, in which the murders were committed during an aggravated burglary and Deruise, in which the murder was committed during an armed robbery.
Notably, however, although the state argued in Connolly that the victim died during *996 the course of an aggravated rape, the evidence arguably did not support a finding of that circumstance beyond a reasonable doubt. Similarly, in this case, the state failed to prove the underlying felony. The absence of such an underlying crime is not critical, however. Cf. State v. Lavalais, 95-0320 (La.11/25/96), 685 So.2d 1048, 1059, cert. denied, 522 U.S. 825, 118 S.Ct. 85, 139 L.Ed.2d 42 (1997) (although juries in Louisiana have historically favored life to death for contract killings, death is not a disproportionate penalty for the offense). For example, the Court upheld the death sentences imposed pursuant to La.C.Cr.P. art. 905.4(10) in Langley, based on the method of the crime by which the defendant garroted the victim after manually strangling him, and Sepulvado, based on the severity of the physical abuse, the length of time over which the abuse occurred, and the horrible nature of the lethal injury.
Here, the state presented evidence that defendant brutally beat the six-year old victim over a lengthy period. The evidence demonstrating the extent of the victim's injuries coupled with that which showed that she had been sexually assaulted and that defendant was at the very least a principal to the offenses leads to the conclusion that death is not a disproportionate penalty in this case.

DECREE
For the reasons assigned herein and in the unpublished appendix, the defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.Code Crim. Proc. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED.
NOTES
[1] Assignments of error not treated in this opinion are addressed in an unpublished appendix to this opinion.
[2] Upon the victim's death, the charges against both defendant and Lora Moseley were upgraded to first degree murder.
[3] The victim did not go to school.
[4] This portion of defendant's statement conflicted with testimony provided by defendant's landlord, William Barnes, who stated that defendant had told him that he shaved the victim's head as punishment for her failure to "sit still in the chair while he was cutting her hair...."
[5] While it is not entirely clear from defendant's statements, it appears that he was concerned that the victim was accusing him of sexually assaulting her and that the beatings were in retaliation for these alleged lies.

In the first statement, defendant stated that Lora Moseley's "first husband Steve had done something to [the victim] physically." Defendant claimed that when he asked the victim, "Why do you lie so much?" she responded, "Well, Steven took three fingers and put here and put two fingers there." Defendant claimed that he told the victim "That's not going to happen to you any more ... No one is going to touch you like that ..." Nonetheless, defendant stated that as time passed "it's been told by people being around her that we were doing this and no one's been around her... no one's done nothing to her." Given these accusations, defendant concluded that the victim had "gone around and told stories... about how this went on and she's gone from one lie to the next lie...."
Later in the statement, defendant appears to discuss recording an instance in which the six-year-old victim enticed him to touch her inappropriately, explaining to the interrogating officers:
.... I went to talk to her about something and ... I mean I just wanted to know if she wanted to goof off, ... maybe go outside and play some football and ah, she said, ah, how did she put it ... I don't know it word for word, but anyway, she stated that.., "If you touch me here, it will make things go away and it will make me feel better," and... so I said, "What, say that again," and so I said, "Hang on," ... so I run and got the tape recorder and I said, "Say it again," and she said it word for word, exactly what she wanted me to do and all that stuff and I said, "No way, ... no way in hell ... I will never do that to you, nor anybody your age, my age or anybody, don't say that again."
[6] Dr. Cogswell and Dr. Ann Springer, a pediatrician, also testified about evidence of sexual abuse suffered by the victim. This evidence is discussed infra, in the portion of the memorandum addressing the sufficiency of the evidence that the victim was murdered during the perpetration or attempted perpetration of an aggravated or forcible rape.
[7] Steve Cropper is the husband of Detective Angela Cropper, the officer who responded the initial call and met the ambulance.
[8] The Nevada statute which defined the crime at the time of the offense read:

Murder of the first degree is murder which is:
(a) Perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate and premeditated killing;
(b) Committed in the perpetration or attempted perpetration of rape, kidnapping, arson, robbery, burglary or sexual molestation of a child under the age of 14 years...."
[9] By emphasizing the serious nature of defendant's conduct, we do not mean to suggest that Lora Moseley was not deeply involved in the abuse of her daughter. This is evident by the fact that she pled guilty to first degree murder in exchange for a life sentence two weeks after defendant's trial.
[10] See generally, Charles A. Phipps, Responding to Child Homicide: A Statutory Proposal, 89 J.Crim. Law & Criminology 535, 572-73 (1999). The author notes that circumstantial proof of intent is almost always required in child homicide cases as such crimes are nearly always committed when the defendant is alone with the child and the defendant will only rarely make a full confession about his intent. Accordingly, courts look to the following factors: (1) the serious nature of the injuries; (2) partial or complete admissions of the conduct alleged; (3) failure to seek medical care; and (4) prior injuries. All of these factors appear to weigh in favor of the Court finding sufficient evidence of intent to kill or inflict great bodily harm in the instant case.
[11] Cogswell stated that it was possible a Foley catheter, inserted to drain the victim's bladder, could have caused that injury.
[12] In addition, at a hearing on the admissibility of evidence, the prosecutor tacitly admitted that the state could not prove that defendant penetrated the victim anally with his penis or that he attempted such penetration, stating:

.... Both the coroner and Dr. Ann Springer are going to testify that the child had been penetrated anally. There is nothere was no semen found or any DNA of any type, so their response is not that the defendant, only they can say that the child had been penetrated anally; can't say by whom; can't say with what. (Emphasis added)
[13] Cf. State v. Martin, 93-0285 (La.10/17/94); 645 So.2d 190, 201, cert. denied, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995); State v. Deboue, 552 So.2d 355, 368 (La.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 174 (1990); State v. Byrne, 483 So.2d 564, 575 (La.1986), cert. denied, 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986) (The failure of one statutory aggravating circumstance found by the jury to support a death sentence does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings). See also Zant v. Stephens, 462 U.S. 862, 884, 103 S.Ct. 2733, 2746, 77 L.Ed.2d 235 (1983) (distinguishing Stromberg in the context of a capital sentencing procedure in which "there is no suggestion that any of the aggravating circumstances involved any conduct protected by the First Amendment or by any other provision of the Constitution ... even if the Stromberg rules may sometimes apply in the sentencing context, a death sentence supported by at least one valid aggravating circumstance need not be set aside ... simply because another aggravating circumstance is `invalid' in the sense that it is insufficient by itself to support the death penalty.").
[14] Furthermore, at least one appellate court has pretermitted a similar inquiry about whether the state presented sufficient evidence under La. R.S. 14:30(A)(2) when it concluded that rational jurors could have found the evidence sufficient to convict the defendant of first degree murder under a different provision of the statute. State v. Ruffin, 572 So.2d 232, 238 (La.App. 1st Cir.1990).
[15] Wessinger explicitly made revival of the contemporaneous objection rule for the penalty phase of a capital trial prospective only. Wessinger, 736 So.2d at 181. In the present case, the defendant's trial in August of 2000 came well after the decision in Wessinger in March of 1999.
[16] For instance, exh. 3 reads:

Don,
We got your letter today. The boys were really glad to hear from you. I'm glad there was happy faces on the back. How are you doing? I know I told you not to write me. But you have to understand at first I was in shock. I'm sorry if I said anything to hurt you. I'm worried about you. I have cried & cried. Please let me know how you are. I know they say your trial is in August in Layfette (sic). I bet your (sic) very nervous & scared. I'm scared for you. The boys are doing ok. They sure have problems but in time they will be ok. Don't worry they will always know you as their dad. Do you have any idea what might happen to you? Please let us know. I pray for you all the time. Today I went to where you use (sic) to live. They moved the trailor (sic). I just stood there staring into space. God, I don't know what to say to make you feel better. Maybe "Butter Head"? Well, maybe you smiled. Please take care of yourself.
Christy.
[17] Jackson also incorporated the three-pronged test from Brooks. Id., 608 So.2d at 956.
[18] It appears that the state was not aware that defendant allegedly admitted to any participation in the offense when he communicated with his ex-wife. In any event, the state failed to offer such evidence at the guilt phase; nor did it inform defendant that it intended to introduce such evidence pursuant to La.C.Cr.P. art. 716(B).
[19] Defendant gave the following recorded statement to the officer who prepared the CSI:

The biggest issue that I've got is Sunday, the 12th of December. Around 10:30 or 11:00 a.m. that morning Laura had Heather in the bathroom with her. It was a fall or a slap in the head, I don't know, but she (Heather) came to me at 11:00 and said she had a headache and asked for something for it. I gave her liquid like Tylenol for kids, like a spoonful. Not one time did Laura show any emotion for Heather. Around 6:30 p.m., Sunday night, she fell. She fell on her head at the Dairy Queen. She was going to put her tray up and she walked kinda sideways and took three steps and fell and hit her head twice. Laura never asked how she was doing, showed nothing for her, up and until the time I picked her up and then she jumped in there. That made me mad, because that was her daughter. Lawrence, my lawyer, said that the blow to Heather's head was caused 2 to 6 hours prior to her falling at the Dairy Queen. When we got back to the trailer Sunday night from Dairy Queen, Heather passed out around 7:40 p.m. and Laura did nothing but hide in the bathroom. Heather began to have like seizures and I tried to give her CPR. All Laura could do was scream, "Save my daughter." I picked up Heather to get her to the car and she was limp in my arms, totally shut down. I called 911 from the next door neighbor's and we decided to go on to the hospital. We met the EMTs at Dixie Inn and they took over from there. Next thing, Heather was at the hospital on life support.
There was also an allegation that I sexually molested Heather. I did not have anything to do with her, I did not. She was spanked so hard that her butt looked like two giant watermelons, I mean, it was bad. You could thump her butt and it was like leather. When her shorts got put on her, it was too tights (sic) for her pants---it was like adult size. Heather was home schooled all the time and Laura got out of hand with Heather. Laura did not have any time for herself and Heather got spanked. And every time she went to the bathroom, her rear was so big, that she went to the bathroom and it would split and it tore and that is how the allegation was made that I had something to do with her, but no, I did not. I spanked her sometimes, but when Laura spanked her for home study, it was for not doing her school work. She had been home schooling Heather since the 1st grade. As far as Heather and all this other stuff, nothing came back positive on me. They took blood, hair and everything. You know, if I did it, then why did I show up to the jail freely, I mean the hospital to check on her. You know if I wanted her dead, then why didn't I just take her out in the woods and bury her and be over with it, but I didn't. You ever want to make a wish and have a clock you can turn things backwards and make all this stuff go away and start over again? Well, that is what I wish I could do.
Laura has a background of incest with her brother. She started a conversation with me about it. She said that when she was in her teens, younger, her brother made her have sex with him. I asked her if she told anyone and she said her mom. He said your mom, didn't she do anything? No, she just blew it off. Gary (defendant's adoptive father), was formally charged with having sex with his daughter Jamie and he got time for it. He had to live in a separate house from the family for a time. Gary could not live in the same house as Jamie. That was in Vista, California, when I was ten. I am not proud of my past.
[20] In the instant case, the state has failed to file a Sentence Review Memoranda as required by La.S.Ct. Rule 28. However, the state addressed the proportionality issue in its brief in response to defendant's assignment of error arguing that defendant's sentence was disproportional.
[21] In State v. Jenkins, 340 So.2d 157 (La. 1976), the defendants, Jenkins, Waters, and Paschal, fatally shot a teller at Peoples Bank & Trust Company of Minden during an armed robbery. All three were convicted of first degree murder and sentenced to death. Their convictions were affirmed, but the death sentences annulled and the defendants sentenced to life imprisonment. In State v. Scott, 362 So.2d 558 (La.1978), the defendant, Lester Scott, was convicted of first degree murder after getting in an argument with the victim during a dice game and almost severing his head. The defendant was sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence. This conviction and sentence were affirmed.

In State v. Hudson, 361 So.2d 858 (La. 1978), Tracy Lee Hudson was convicted by a jury of the first degree murder of Wendell G. Craig. The two men were arguing in the trailer park in which they lived, when defendant stabbed and killed the victim. The defendant was sentenced to life imprisonment. This Court affirmed his conviction and sentence, which was later reversed by the United States Supreme Court on double jeopardy grounds. State v. Burnham, 369 So.2d 1331 (La.1979), involved the beating death of a man who made sexual advances towards the defendant at a bar. Defendant was convicted of first degree murder and sentenced to life imprisonment. His conviction and sentence were affirmed. State v. Clark, 375 So.2d 383 (La.1979), involved the shooting of a 19-year-old girl as she stood next to the defendant's wife in Ms. Clark's home. Following a night of drinking, defendant broke into his estranged wife's home where he fired the fatal shot. The 42-year-old defendant was convicted of first degree murder and sentenced to life imprisonment. In State v. Gaskin, 412 So.2d 1007 (La.1982), and State v. Thomley, 420 So.2d 685 (La.1982), the two teenage defendants and a third accomplice grabbed the victim off of the street on Halloween night, threw her into their car, and forced her to perform oral sex on them as they drove through rural Bossier Parish. At the end of the ride, Thomley removed the young girl from the automobile, let out a "rebel yell" and slit her throat. Gaskin then finished her off by repeatedly stabbing her. Gaskin and Thomley were convicted of first degree murder and sentenced to life imprisonment. Their accomplice turned state's evidence, pled guilty to armed robbery and was sentenced to thirty years. State v. Moore, 414 So.2d 340 (La.1982), cert. denied, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983), involved the rape and murder of a young mother committed in the victim's home. The defendant stabbed the victim fourteen times following a rape perpetrated in the presence of the victim's four month-old daughter. The murder was also preceded by a ransacking of the victim's homeMoore's conviction of first degree murder and sentence of death were affirmed. State v. Knighton, 436 So.2d 1141 (La.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984), involved the murder of a service station attendant during the commission of an armed robbery. Knighton was sentenced to death and his conviction and sentence were affirmed. In State v. Wingo, 457 So.2d 1159 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985), Jimmy Wingo and Jimmy Glass forcibly entered the home of Mr. and Mrs. Newt Brown. They bound and gagged the Browns, ransacked the house, and stole a large amount of money, a .38 caliber pistol, a.30-.30 lever action rifle, a shotgun, and some items of clothing. They then killed Mr. and Mrs. Brown by shooting them execution style in the back of the head. The defendants were convicted of first degree murder and sentenced to death. Their convictions and sentence were affirmed. State v. McGuffey, 486 So.2d 1101 (La.App.2d [Cir.]1986), writ denied, 501 So.2d 767 (La.1987), involved the murder and sexual mutilation of 46-year-old Earline Crabtree. McGuffey and his victim had arranged a late night rendezvous in a rural area following the close of the defendant's tavern. The victim's body was subsequently discovered in a pond. Her rings and money were missing. She had been stabbed repeatedly and almost all of her facial bones had been broken. Her pubic hair had been "scalped" and a foreign object had been forced into her vagina. Each wound was inflicted before death. McGuffey was convicted of first degree murder and sentenced to life imprisonment. His conviction and sentence were affirmed. In State v. Byrne, supra, Edward Byrne, Jr., bludgeoned his girlfriend, Roberta Johnson, to death during the course of an armed robbery. He was subsequently convicted of first degree murder and sentenced to death. His conviction and sentence were affirmed. In State v. Monds, 91-0589 (La.App. 4th Cir.1/14/94), 631 So.2d 536, writ denied, 94-0626 (La.4/22/94), 637 So.2d 164, James Monds was convicted of the stabbing death of Vicky Thomas. Thomas suffered a total of 19 wounds with the fatal wound cutting through all major parts of her neck. Defendant was convicted of first degree murder and sentenced to life imprisonment. The court of appeal reversed his conviction on the basis of insufficient evidence. In State v. Jordan, 31,568 (La.App.2d Cir.2/24/99), 728 So.2d 954, writ denied, 99-0893 (La.10/8/99), 750 So.2d 177, James Kevin Jordan repeatedly stabbed and strangled Jimmy Hudson, Jr. He was convicted of first degree murder, but the jury deadlocked during the penalty phase and accordingly, the court sentenced him to life imprisonment. His conviction and sentence were affirmed on appeal. In State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022,
cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000), the 35-year-old defendant entered the apartment of the 12-year-old victim who was a friend of his daughter. He tied the victim up with duct tape, beat her, sexually assaulted her and strangled her to death. A jury convicted the defendant of first degree murder and sentenced him to death. The conviction and sentence were affirmed by this Court. In State v. Coleman, 32,906 (La. App. 2 Cir. 4/5/00), 756 So.2d 1218, writ denied, 00-1572 (La.3/23/01)[, 787 So.2d 1010], the 17-year-old defendant killed an elderly couple as they prepared for an extended vacation. The defendant had previously performed yard work for the couple and knew they would typically withdraw large amounts of cash from the bank before leaving on trips. The victims were beaten to death with an iron rod and a pair of pliers. A jury convicted the defendant of first degree murder but could not agree on a sentence. Accordingly, the court sentenced him to life imprisonment at hard labor. The conviction and sentence were affirmed on appeal.
[22] In State v. Loyd, 489 So.2d 898 (La. 1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1984, 95 L.Ed.2d 823 (1987), the twenty-five-year-old white defendant kidnapped a three-year-old white female victim, raped her vaginally and anally, and drowned her in a ditch. On October 29, 1993, the sentence was vacated by the United States Fifth Circuit on grounds of ineffective assistance of counsel at penalty phase. The state was ordered to sentence the defendant to life imprisonment or retry the sentencing phase. That prosecution is now underway. See State v. Loyd, 96-1805 (La.2/13/97), 689 So.2d 1321 (commutation instruction mandated by La.C.Cr.P. art. 905.2(B), 1995 La. Acts No. 551, may apply to the defendant's resentencing penalty trial although it was not in effect at the time of the offense.).

In State v. Brogdon, 457 So.2d 616 (La. 1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985), the 19-year-old defendant and a 17-year-old accomplice lured the 11-year-old victim into their car, drove her to an isolated spot, raped her repeatedly, forced oral sex, and then tortured her by beating her with a brick, shoving sharp objects into her vagina, and cutting her with a broken bottle. The defendant, who was borderline mentally retarded, was under the influence of alcohol at the time.
In State v. Copeland, 530 So.2d 526 (La. 1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989), the defendant and his co-defendant, George Brooks, repeatedly raped an eleven-year-old boy and shot him several times.
In State v. Deboue, supra, during the course of an aggravated burglary, the defendant slashed the throats of his six and 11-year-old victims allowing them to drown in their own blood.
In State v. Sepulvado, 93-2692 (La.4/8/96), 672 So.2d 158, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996), the defendant, over a three day period, tied a rope around his six-year-old stepson's neck, threatened to hang him, beat him, put his head in the toilet and flushed, refused to feed him, kicked him from one room to another, and, finally, put him in a tub of scalding water which produced third degree burns over sixty percent of the victim's body.
In State v. Connolly, 96-1680 (La.7/01/97), 700 So.2d 810, the defendant, a Sunday school teacher, slashed the throat of his nine-year-old victim behind the church after church services. The victim was found alive, in a pool of blood by his father, but died shortly after arriving at the hospital. The state argued that the victim was sexually abused by the defendant based upon the dilation of the victim's anus, although no other evidence supported this claim.
In State v. Langley, 95-1489 (La.4/14/98), 711 So.2d 651, the defendant choked a six-year-old boy with his hands and then garrotted the victim with nylon line and stuffed a dirty sock into the victim's mouth. On remand from this Court, the district court quashed the grand jury indictment on grounds of racial discrimination in the selection of grand jury forepersons in East Baton Rouge. This Court affirmed that ruling, thus paving the way for retrial of the case. State v. Langley, 95-1489 (La.4/3/02), 813 So.2d 356.
In State v. Deruise, 98-0541 (La.4/3/01), 802 So.2d 1224, cert. denied, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001), the defendant shot and killed an eleven-month-old infant during an armed robbery.
In State v. Deal, 00-0434 (La.11/28/01), 802 So.2d 1254, cert. denied, ___ U.S. ___, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002), the defendant killed his two-month-old son by sticking a paper towel down the child's throat to cut off his airway, and when this did not succeed in stopping the child's crying, the defendant picked the child up and threw him against the crib, fracturing the baby's skull.
In State v. Carmouche, 01-0405 (La.5/14/02), ___ So.2d ___, 2002 WL 984306, the defendant killed his girlfriend and two children, aged 15 and two.