WILLIAMS, J.
|, The defendant, Anthony Paul Johnson, was charged by grand jury indictment with second degree murder, a violation of LSA-R.S. 14:30.1. After a jury trial, the defendant was found guilty as charged. The defendant’s motion for new trial was denied. The trial court sentenced defendant to serve life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. The defendant appeals his conviction. For the following reasons, we affirm.
FACTS
In the early morning hours of August 30, 2008, two individuals fired multiple shots from assault rifles into a residence at 3134 Lillian Street in Shreveport. At the time of the shooting, several residents were asleep in the home, including a 17-month-old child, L.A.,[1] who was struck in the chest by a bullet while he slept in a playpen. The child died as a result of the wound.
After the shooting, the police recovered 23 assault rifle shell casings from an alley behind the house. Multiple bullet holes were found in the walls of the house, including in the living room, where L.A. had been sleeping. Police investigators learned that before the shooting, there had been a fight between Travarrius (“My Pooh”) Adams and Marcus Jackson because they were both interested in the same girl. The fighting between these two and their friends had escalated to the display of weapons and gunfire. The defendant was an acquaintance of Marcus Jackson and had been seen holding a rifle some hours before the shooting. After the police investigation, the defendant was arrested and charged with second degree J^nurder.
The factual situation was presented through trial testimony. Ronnie Taylor testified that he was a friend of Travarrius Adams and that on a prior occasion, when they were walking home from school, shots were fired at them by Darrius Williams, Marcus Jackson and his brother, Mario Jackson. Taylor stated that on the evening before the shooting, he had attended a high school football game with Adams. Taylor testified that while walking home alone afterwards, he was stopped by Mario Jackson, Darrius Williams and defendant, who were all riding in a vehicle. Taylor stated that they spoke briefly and he saw that the defendant was holding a “chopper,” which Taylor said is slang for a machine gun. On cross-examination, Taylor stated that defendant did not point the gun at him.
Shadominique Randall testified that in the early morning hours of August 30, 2008, she was at the Shreveport home of Mario and Marcus Jackson, who were present along with Darrius Williams and the defendant. She stated that she saw three “long guns” in the living room and that Darrius was playing with one of the guns. Randall testified that Darrius, Mario, defendant and herself left the house and were driven to Bossier City in the vehicle of Tomtieja Bates. After returning to Shreveport, Bates drove to Lillian *708 Street and parked the car near an alley. Randall stated that the defendant, Mario and Darrius then left the car and ran across the street to the alley, leaving her and Bates in the vehicle. Randall testified that she did not see the men with guns because it was dark outside, but after they went into the alley she heard gunshots. Initially, Randall stated that when the |amen returned to the vehicle, she did not see defendant with a gun. However, after being shown her prior grand jury testimony, Randall recalled that upon returning to the vehicle after the gunfire, defendant was carrying a long gun.
Antonia Reed, the mother of the victim, testified that she lived at the residence with Legary Adams, the older brother of Travarrius Adams. She stated that Tra-varrius sometimes slept at their house, but he was not present the night of the shooting. Reed stated that she was awakened by a loud noise and that she and Legary then rushed to check on their children. Reed testified that bullets were fired into the living room, where the victim was sleeping in a playpen that night. Reed stated that when she saw the child, he was unconscious and bleeding. The child did not respond to the CPR efforts of Shreveport Police Corporal Jeremy Edwards, who had arrived at the scene of the shooting.
Richard Beighley, the firearm section supervisor of the North Louisiana Crime Lab, was accepted as an expert criminalist with specific expertise in firearms identification. Beighley testified that the lab received 19 fired 7.62 x 39 caliber shell casings, which were all the same brand of Wolf ammunition. Beighley opined that 15 of the shell casings were fired from the same weapon, a military assault rifle. Beighley stated that there may have been a second rifle fired because four shell casings were not definitively matched, but that he could not be certain.
Dr. James Traylor, an expert in forensic pathology, performed the autopsy on L.A. and testified that the cause of the child’s death was a [/single, through-and-though gunshot.” In description, Dr. Traylor stated:
The entry was to, just below the level of the left nipple, and then came out just right at the midline over the right side of the back. And in passing from the entry to the exit caused some damage to the heart, ... the thoracic aorta, the part that’s contained within your chest, and then passed through into the abdominal cavity, caused some injury to the left lobe of the liver and ... caused injury to the spinal cord before it came out.
Dr. Traylor explained that as a result of the wound, the child bled to death.
Mario Jackson testified that on the night of the shooting he had been a passenger in Bates’ vehicle with Randall, Darrius and the defendant. Jackson stated that the guns were located in the trunk of the car. Jackson testified that Darrius had said that “he wanted to kill someone” and suggested they “go to My Pooh’s house.” Jackson stated that he, Darrius and defendant got out of Bates’ car on Lillian Street and grabbed the guns. Jackson stated that he walked across the street with them, but then turned around in fear. He testified that Darrius and defendant continued walking into the alley with cocked guns. Jackson stated that he then heard about 30 to 40 gunshots and that he could tell two guns were fired because “one was louder than the other one.” Jackson testified that after returning to the car, the defendant said that his gun had jammed while firing. Jackson stated that they all drove back to his house and that the defendant left with a gun. On cross-exami *709 nation, the defense counsel highlighted Jackson’s grand jury testimony that defendant had not said anything after leaving the alley. Jackson acknowledged his earlier testimony, but explained that he was young, confused and nervous at the time. Jackson stated that he knew Darrius and defendant were the shooters, but he did not know which of them |sshot the baby.
Tomtieja Bates testified that he was the driver on the night of the shooting and that he drove to Lillian Street because Darrius had said he wanted to “holler at My Pooh.” Bates stated that Mario, Darri-us, and the defendant got out of the car, that he saw all three walk down the alley, and that he then heard gunfire that sounded like it came from an assault rifle. Although he did not remember whether defendant and Mario returned with guns, Bates testified to seeing both the defendant and Darrius with guns when he dropped them off at Mario’s house. Bates acknowledged that he was the owner of one of the assault rifles that were in his car that night.
After trial, the jury unanimously found defendant guilty of the second-degree murder of L.A. The defendant was sentenced to serve life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. This appeal followed.
DISCUSSION
The defendant contends the evidence was insufficient to convict him of second degree murder. Defendant argues that the evidence did not prove guilt beyond a reasonable doubt because there was no showing of specific intent and neither Randall nor Mario Jackson witnessed the shooting.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). When the conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict on the direct evidence by viewing that evidence in the light most favorable to the state. When the direct evidence is so viewed, the facts established by the direct evidence and reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Jacobs, 504 So.2d 817 (La.1987); State v. Mims, 39,757 (La.App.2d Cir.6/29/05), 907 So.2d 237.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a fact finder’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, 43,786 (La. App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed *710 by the trier of fact, is sufficient support for a |7requisite factual conclusion. State v. Gullette, 43,032 (La.App.2d Cir.2/13/08), 975 So.2d 753; State v. Burd, 40,480 (La. App.2d Cir.1/27/06), 921 So.2d 219, unit denied, 2006-1083 (La.11/9/06), 941 So.2d 35.
Second degree murder is the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1. All persons concerned in the commission of a crime, whether they directly commit the act constituting the offense, aid and abet in its commission or counsel another to commit the crime, are principals. LSA-R.S. 14:24.
Under Louisiana law, a person may be convicted of intentional murder even if he has not personally struck the fatal blows. State v. Wright, 01-0322 (La.12/4/02), 834 So.2d 974; State v. Mitchell, 39,305 (La. App.2d Cir.2/17/05), 894 So.2d 1240, unit denied, 2005-0741 (La.6/3/05), 903 So.2d 457. Only those persons who knowingly participate in the planning or execution of a crime are principals. State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427. Mere presence at the scene is not enough to “concern” an individual in a crime. However, it is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed. Mitchell, supra; State v. Logan, 36,042 (La.App.2d Cir.6/14/02), 822 So.2d 657, writ denied, 02-2174 (La.9/19/03), 853 So.2d 621. A defendant may be convicted as a principal only for those crimes for which he has the requisite mental state. Wright, supra. In a specific intent homicide, the state must show more than the defendant’s direct or indirect involvement; the state must prove that the defendant specifically intended to | «kill or inflict great bodily harm. State v. Pierre, supra.
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. LSA-R.S. 14:10(1). Specific intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Mitchell, supra.
In this case, the state presented the testimony of Shreveport Police Detective Robert Gordon, who stated that the police investigation indicated Travarrius Adams was the intended target of the shooters. With respect to the murder weapon, which was not located, Beighley testified that the 19 spent shell casings he examined were the type of ammunition generally fired from a military assault rifle, an AKM or SKS. In addition, Beighley stated that 15 of the shell casings were fired from the same rifle and that a second rifle could have been fired, because four shell casings were not definitively matched with the others.
Regarding the night of the shooting, Randall testified that she had seen three to four “long” guns at Mario Jackson’s house and that they were driven to Lillian Street, where the defendant, Mario and Darrius hopped out of the car. Randall testified that after they reached into the trunk, all three were holding “something big” in their hands as they ran across the street. Randall stated that she then heard multiple gunshots and that defendant returned to the vehicle carrying a long gun with a “banana clip,” indicating an assault rifle.
| Mario Jackson testified that Darrius Williams had said he wanted to kill someone and directed Bates to drive to the residence on Lillian Street, where “My Pooh” Adams was thought to be staying. Mario stated that he, Darrius and defendant then armed themselves with rifles. Mario testified that after defendant and *711 Darrius entered the alley without him, he heard 30 to 40 gunshots, that defendant returned with an assault rifle in his hand, and that defendant stated that his gun had jammed as he fired. In his testimony, Bates admitted driving the group to the house on Lillian Street. Bates stated that he heard gunfire from assault rifles after defendant and the other two exited the car and that he saw defendant with a rifle when they returned to Mario’s house.
The record shows that the crime involved two shooters. Although defendant complains that neither Randall nor Mario witnessed the actual shooting, the jury could reasonably conclude from the circumstances described by those witnesses that defendant rode to the house with a person who had expressed the desire to kill Travarrius Adams and that defendant intentionally fired multiple gunshots into the residence where the victim was sleeping.
Further, the actions of defendant and Darrius in riding to a specific location, arming themselves with assault rifles and discharging their weapons into the residence at 3134 Lillian Street demonstrate their intent to kill or inflict great bodily harm upon a person in the residence that night. The situation involving defendant is similar to those in which multiple gunshots are fired in the direction of a crowd of people in an effort to kill |inone specific person, but another person is harmed. See Mitchell, supra. Even in such circumstances, the jurisprudence confirms that there is no requirement to inflict great bodily harm upon any one intended victim in the crowd, so long as the circumstances indicate that the offender actively desired that great bodily harm follow as a consequence of his act.
Although defendant may not have intended to kill this particular victim, the evidence presented supports a finding that defendant knowingly participated in firing multiple gunshots at a house with the specific intent to kill or inflict great bodily harm upon someone inside the residence and that a person was killed as a result. Thus, a rational trier of fact reasonably could have found that the elements of second degree murder were proved beyond a reasonable doubt. Accordingly, the assignment of error lacks merit.

Juror Selection

The defendant contends the trial court erred in finding that he committed a Batson violation in exercising peremptory challenges of prospective jurors Alan Beasley and Steven Nicholson. Defendant argues that by impermissibly shifting the burden of persuasion onto him, the trial court failed to require the state to satisfy its burden of proving purposeful discrimination in defendant’s exercise of peremptory challenges.
The United States Supreme Court has held that the use of peremptory challenges to exclude potential jurors based upon their race violates the Equal Protection Clause. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); State v. Nelson, 2010-1724, 2010-1726 (La.3/13/12), 85 So.2d 21. The Batson decision is codified in our law in LSA-C.Cr.P. art. 795. While Batson specifically addressed the prosecutor’s use of peremptory challenges, its holding is equally applicable to criminal defendants. Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). The Court in McCollum specifically held that “the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges.” 505 U.S. at 59, 112 S.Ct. 2348; Nelson, supra. Using the reasoning in McCollum, the Louisiana Supreme Court has held that the state may invoke Batson where a black criminal de *712 fendant exercises peremptory challenges against white prospective jurors. State v. Knox, 609 So.2d 803 (La.1992). An accusation by the state that defense counsel has engaged in such discriminatory conduct has come to be known as a “reverse-Batson ” challenge. Nelson, supra.
In Batson, the court outlined a three-step test for determining whether a peremptory challenge was based on race. Under Batson and its progeny, the opponent of a peremptory strike must first establish a prima facie case of purposeful discrimination. Second, if a prima facie showing is made, the burden shifts to the proponent of the strike to articulate a race-neutral explanation for the challenge. Third, the trial court must then determine if the opponent of the strike has carried the ultimate burden of proving purposeful discrimination. Batson, supra; Nelson, supra.
When a striking party offers race-neutral reasons for the use of peremptory challenges, the preliminary issue of whether the opponent made |(2a prima facie showing is moot. Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); Nelson, supra. At the second step of the Batson inquiry, the issue is the facial validity of the striking party’s offered race-neutral explanation. This reason does not need to be persuasive or even plausible, but must be more than a mere affirmation of good faith. Unless a discriminatory intent is inherent in the striking party’s explanation, the reason offered will be deemed race-neutral. Hernandez, supra; Nelson, supra. The burden in step two is one of production, not one of persuasion. Nelson, supra.
In step three of the Batson analysis, the court then evaluates the persuasiveness of the justification proffered by the striking party, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. At this step, the court must determine whether the opponent has carried his burden of proving purposeful discrimination. Nelson, supra.
In the present case, following a number of peremptory challenges by the defense during jury selection, the state noted to the court that all five of the defense challenges had been used to strike Caucasians, but did not object at the time. After the next round of peremptory challenges, the state made a reverse Batson objection asserting that the defendant’s use of challenges showed a pattern of racial discrimination against potential Caucasian jurors. At that point, the court noted:
Based on the numbers of challenges exercised, that being eight of ten for Caucasians, and based on the fact that the state has previously made defense counsel and the court aware ... with regard to any Batson issues, the Court does find that there is a 11 oprima facie showing, and at this time will ask defense counsel to give race-neutral reasons for their exercise of peremptory challenges.
In providing race-neutral reasons for striking potential juror Adam Beasley, the defense counsel stated:
Your Honor, we challenged Mr. Beasley because, simply for the fact that he and Mr. Cox seemed to have a special relation in the questioning, in that Mr. Cox talked a lot about some old movie theater goings on, and I just felt they had a special connection, and so we challenged him for that reason.
The court then asked for the state’s response. The prosecutor replied that he had asked Beasley about his background in television and whether he recalled a local program that was broadcast many years ago. The state asserted there was “no special relationship there. None of his *713 answers suggested any favoritism to one side or the other.” At that point, the court stated that it would re-visit the challenge to Beasley.
Continuing his reasons, defense counsel stated that potential juror Steven Nicholson was excused because he “has small boys. I believe he is one of the only jurors that has small kids.” In opposition, the state replied that several black jurors, who were also parents of young children, were not similarly challenged by defendant. After considering the voir dire responses of other potential jurors, the court issued the following ruling:
The Court: ... The Court finds that based on the fact that defense counsel did not exercise a peremptory strike with regard to Taffanie Lewis a black female who testified she had two children, one age six and one age seven, and in contrast the defense counsel said they exercised a peremptory strike with regard to Steven Nicholson because he had two children, age eight and age nine, the Court finds that that is not a race-neutral reason. 114The Court finds that the defense counsel exercised a peremptory strike with regard to Mr. Nicholson for reasons other than race neutral when compared to the fact that an African American female who had two children, ages six and seven was kept by the defense counsel. So the Court does not find defense counsel’s reasoning with regard to Mr. Nicholson, or does not find defense counsel’s argument with regard to Mr. Nicholson to be race-neutral. Are there any other reasons, Mr. Thomas, why you exercised a peremptory strike -with regard to Steven Nicholson?
Mr. Thomas: No, Your Honor, just note my objection.
The Court: The Court finds that there is violation of reverse Batson, and that is McCollum with regard to Steven Nicholson. The Court also cites a recent Louisiana Supreme Court opinion in which this Court was reversed on this, a very similar issue in the case of State v. James Mason.
Returning to the challenge of Beasley, the court repeated defendant’s race-neutral explanation and asked for the state’s response. The state replied that r in answer to questioning, Beasley had simply said he remembered an old television program. The prosecutor stated that he had never met Beasley before and denied that their shared memory created a special relationship. The trial court then issued its. ruling:
Well, the court will note for the record that Mr. Cox, as other attorneys do from time to time, will get into questions concerning just the background and the hobbies of prospective jurors.... I would note that Mr. Cox typically does that, and ... that’s what Mr. Cox was doing in that with regard to Mr. Beasley, as Mr. Cox did with, for example, Ms. Hart, who is a young black female, 24 years of age, Mr. Cox asked Ms. Hart several questions concerning her hobbies on singing, joked with her as to whether she knew Bobby Darin and things of that nature. And frankly, Mr. Cox was, seemed to build a nice rapport with Ms. Hart....
11fiSo we could go through several examples of Mr. Cox joking with the prospective jurors in a very similar manner as he did with Mr. Beasley regarding the old KTBS shows that far predate me. So for those reasons the Court does not find that the defense counsel has articulated a race-neutral reason for excusing Mr. Alan Beasley.... It is a very difficult issue to tackle, particularly for Dis *714 trict Court judges to make that call as we are sitting here. But we do sit here, and we see things that do not make the record ... Having said that, the Court finds that the defense counsel has failed to give race-neutral reasons with regard to juror Steven Nicholson, a white male, and with regard to Alan Beasley, a white male. With regard [to] all of the other prospective jurors, the Court does find that the defense did give race-neutral reasons for the exercise of the peremptory challenges.
Citing Nelson, supra, the defendant contends the trial court erred in shifting the burden of proof to him with regard to his peremptory challenges of prospective jurors Nicholson and Beasley. However, the situation in this case can be distinguished from that of Nelson, in which the court heard and rejected Nelson’s race-neutral reasons for the peremptory challenges on the basis that they failed to rebut the state’s prima facie showing of discrimination. Here, unlike the situation in Nelson, the trial court heard the defendant’s race-neutral explanations for striking Nicholson and Beasley and then, before ruling, proceeded to the third step of Batson by requiring the state to present factual circumstances demonstrating that those peremptory challenges were made with discriminatory intent.
Considering the defendant’s argument, we note that the trial court may have created confusion by expressing its ruling on the state’s Batson challenge as a finding that defendant failed to give race-neutral reasons for striking prospective jurors Nicholson and Beasley. The record shows that the defendant did provide race-neutral reasons, which the trial court then assessed and found unpersuasive in those two instances. In performing the | 16third step of the Batson inquiry, the court effectively found that defendant’s race-neutral explanations for striking those jurors were a pretext based on evidence of the defendant’s discriminatory intent presented by the state.
In determining whether the state carried its burden of proving purposeful discrimination, the trial court found that the interaction between the prosecutor and Beasley did not indicate a special relationship when compared to the rapport between the prosecutor and some black potential jurors who were not similarly stricken by defendant. Regarding Nicholson, the court pointed out that defendant did not similarly strike a black potential juror who was also a parent of young children. If a party’s proffered reason for striking a person of one race from the jury applies just as well to a person of another race who is permitted to serve, then that fact is evidence tending to prove purposeful discrimination to be considered at Batson’s third step. Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005); State v. Sparks, 1988-0017 (La.5/11/11), 68 So.3d 435.
Here, the state pointed out to the trial court that the defendant’s proffered reasons for striking white potential jurors Beasley and Nicholson were equally applicable to several nonwhite potential jurors who were not stricken by defendant. Based upon the evidence presented and applying the Batson analysis to the circumstances of this case, we cannot say the trial court erred in concluding that the state satisfied its burden of proving that defendant acted with discriminatory intent in his peremptory challenges of Beasley and Nicholson.

117Evidentiary Issues

In two assignments of error, the defendant contends the trial court erred in denying his motions for continuance and for mistrial on the grounds that the state failed to timely disclose exculpatory evi *715 dence. Defendant argues that he was denied a fair trial because the state’s late disclosure of exculpatory and impeachment evidence prejudiced his ability to present a defense.
Prior to trial, defense counsel filed a “Motion for Continuance,” alleging that he had not received several discovery requests, including the taped statements of Travarrius Adams, Shadominique Randall, Mario and Marcus Jackson, and that such discovery was relevant and would likely lead to other discoverable evidence. The state filed an opposition asserting that the defendant’s lawyer had been provided with all media in the state’s possession, “specifically 22 CDs and 3 DVDs” and that “the defendant is not entitled to any witness statements unless they contain Brady material.” The prosecutor further stated, “[t]he state furnishes all statements to the defendant as part of its open discovery policy.” At a hearing on the matter, the trial court denied the motion for the following reasons:
Well, unless the statements contain Brady material the state is not obligated to provide witness statements. And, as Mr. Cox points out, they do so as a courtesy but they are not required to do so unless they contain Brady material. The case is quite old and although you are relatively new to the case there’s been adequate time to prepare, I’m going to deny the motion to continue.
On the day of trial, the defense moved for a mistrial on the ground that defendant had only received the grand jury testimony the night before. 11sThe defense counsel stated:
Yes, your Honor, there is one matter. Last night we received grand jury testimony, Brady material. We have been requesting this Brady material for quite some time. I believe in March, on March 5th we had filed a supplemental motion for discovery seeking certain transcripts or recordings. We came to court on May 9th, it still had not been provided.
On May 9th it was provided to us, and I believe the — Mr. Cox, you’ll have to check the record for my accuracy, but Mr. Cox indicated that the information was not Brady material, but he was providing it to the defense anyway. I reviewed the information, I discovered that it was, in fact, Brady material. I filed a subsequent motion to quash the indictment. I asked the Court to do an in camera inspection of the grand jury testimony. Last night we finally got the information, so at this point we move for a mistrial ... We have not had proper time to prepare his defense based on the Brady material that we have received. My client has still not gone over all of the transcripts.
In response, the state pointed out that the defense had possessed for many months all of the transcribed statements of the witnesses in the case and that the state had given the grand jury testimony to the defense only because of “certain inconsistencies.” In addition, the state asserted that there is jurisprudence which bars the use of a grand jury transcript to cross-examine a witness based on his grand jury testimony. The defense stated that the state had previously provided 13 pages of transcribed grand jury testimony.
The state explained that the transcripts delivered the night before consisted of testimony from Mario Jackson, Marcus Jackson, and Tom Bates. The prosecutor stated:
The reason is, Your Honor, I — as I began to prepare this case for trial between May and June the 25th I spent more time with it than I had before, and I located this additional material. It was not a question of withholding the *716 material, it was a question of trying ten other cases leading up to this one, and all the preparation for that. So I got to it as soon as I could, and when I got to it I gave it to Mr. Thomas.
| iaThe defense stated that the complete grand jury transcripts of those witnesses totaled 76 pages. In response, the court stated:
Well, that will be the ruling for today, that those three witnesses will not be called, giving Mr. Thomas an opportunity to review the entire grand jury testimony. He may use the grand jury testimony for impeachment purposes in the trial. All right. And by the way, we’re going to break about 5:00 o’clock today, and that will give Mr. Thomas some [time this] afternoon to review that.
At trial, Ronnie Taylor testified that on the evening of August 30, 2008, he had attended a high school football game with Adams, but that he walked home alone afterwards. At that point, defense counsel objected to the rest of Taylor’s testimony and stated that it was inadmissible as evidence of other crimes, wrongs, or acts under LSA-C.E. art. 404(B).
Outside the presence of the jury, Taylor testified that he was stopped during his walk by Mario Jackson (brother of Marcus Jackson), Darrius Williams and the defendant, who were all riding in a vehicle. Taylor stated that defendant was holding a “chopper” in his lap, and that a chopper was slang for a machine gun. The following discussion ensued:
Mr. Cox: Your Honor, I’m going to respectfully submit that that does not constitute other crimes evidence. He’s lawfully entitled to possess that weapon, but I do think it’s probative.
The Court: Was Anthony Johnson a convicted felon at the time of this offense? Did he have any enumerated felonies that would make it unlawful for him to possess a firearm?
Mr. Cox: Your Honor, I do not believe so. Mr. Clerk, could you double check me on this. We do have a rap sheet, I think, for Mr. Johnson. Your Honor, Mr. Johnson did not have anything on his rap sheet at that time. 12pThe Court: All right. Any argument?
Mr. Thomas: Your Honor, the objection was that this testimony is other crimes’ evidence. I think the witness indicated that Mr. Johnson had the weapon, it was cocked, and he was bobbing his head up and down. That appears to be a threat to me.
The Court: Okay. Well, the witness testified that Anthony Johnson had what he termed as a chopper in the car, but he never pointed it at him, never fired the weapon, and never pointed it at the witness. And the defendant was not a convicted felon at the time, for which it would be unlawful for him to possess a firearm. This is not an automatic weapon, there is no evidence to show that these were fully automatic weapons, so there is no showing that it was unlawful for him to possess a firearm at the time that the witness was testifying [about], so I don’t find that this is reference to other crimes, and I’ll allow the testimony.
Within the presence of the jury, Taylor testified about being stopped by the defendant, Darrius, and Mario Jackson around 11:00 p.m., and that defendant was holding a large gun while bobbing his head up and down.
Suppression by the prosecution of evidence favorable to an accused upon his request for such evidence violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecu *717 tion. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194,10 L.Ed.2d 215 (1963); State v. Barker, 628 So.2d 168 (La.App. 2d Cir. 1993), writ denied, 93-3194 (La.3/25/94), 635 So.2d 236. The term “Brady violation” is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence. There are three components of a true Brady claim: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either wilfully or | ¡^inadvertently; and (3) prejudice must have ensued. State v. Garrick, 03-0137 (La.4/14/04), 870 So.2d 990. A discovery violation involving the state’s failure to disclose exculpatory evidence does not require reversal as a matter of due process unless the non-disclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different result. Id. In the event of a discovery violation, the court has the discretion to permit the discovery of the undisclosed material, order a mistrial, grant a continuance, prohibit the introduction of the undisclosed material, or any other order, except dismissal, that is appropriate. LSA-C.Cr.P. art. 729.5.
Not every failure by the state to comply with these disclosure rules automatically requires a reversal. Only when such a failure results in prejudice to the defendant does it constitute reversible error. In the event of the state’s failure to comply with the discovery rules, it must be determined whether the defendant was actually prejudiced by the non-disclosure and whether the trial court abused its discretion. State v. James, 38,353 (La.App.2d Cir.5/12/04), 873 So.2d 858. It is only when the defendant is lulled into a misapprehension of the strength of the state’s case through the prosecution’s failure to disclose timely or fully, and the defendant suffers prejudice when the undisclosed evidence is used against him, that basic unfairness results which constitutes reversible error. State v. Allen, 94-2262 (La.11/13/95), 663 So.2d 686. The effects of a discovery violation may be remedied by effective cross-examination. State v. James, supra.
The issue is whether the 76 pages of transcribed testimony contained 1 ^evidence in favor of the defendant. The grand jury testimony at issue shows that none of the witnesses indicated that defendant was not a participant in the shooting. To the contrary, they all pointed to defendant as being one of the shooters. Therefore, this evidence did not qualify as exculpatory evidence. Even if the testimony could be considered impeachment evidence favorable to an accused under Brady, we note that defendant was provided time to review the testimony and was able to cross-examine the witnesses as to any inconsistencies. Thus, there was no showing that the defendant was prejudiced by the late disclosure of the grand jury transcripts. Accordingly, the trial court did not abuse its discretion in denying the defense’s pretrial motion for continuance and his motion for mistrial. The assignments of error are without merit.
The defendant also contends the trial court erred in admitting evidence of other crimes without prior notice to him by the state. Defendant argues that Ronnie Taylor’s testimony was inadmissible as evidence of other crimes or wrongs that the state sought to introduce to show defendant as a bad person.
A crime is that conduct which is defined as criminal in the Louisiana Criminal Code, or in other acts of the legislature, or in the constitution of this state. LSA-R.S. 14:7. Evidence of other crimes is inadmissible for the purpose of proving *718 that the defendant acted in conformity with a bad character. However, such evidence may be admissible for the purpose of proving intent, preparation, plan or identity. LSA-C.E. art. 404(B). If the state seeks to present such evidence, it must comply with the requirements |^of Article 404(B) and State v. Prieur, 277 So.2d 126 (La.1973), which provide that before trial the state must notify the defendant of its intent to use other crimes evidence, so that the district court may conduct a hearing to determine if the evidence is admissible. When evidence of other crimes is improperly admitted at trial, the error is subject to harmless error review and will be deemed harmless if the verdict is unattributable to the error. State v. Parker, 42,311 (La.App.2d Cir.8/15/07), 963 So.2d 497, writ denied, 2007-2053 (La.3/7/08), 977 So.2d 896.
In the present case, Taylor testified that defendant was holding a firearm in his lap and bobbing his head up and down, but that defendant did not point the firearm at him or verbally threaten him. The trial court found that defendant’s possession of a firearm was not a crime since he was not a convicted felon at the time. Therefore, the court reasoned that Taylor’s testimony did not constitute evidence of other crimes or wrongs. Based upon this record, we cannot say the trial court erred in admitting the testimony describing defendant’s act of nodding his head while holding a weapon.
Even if this evidence did constitute Article 404(B) material, the testimony that defendant was armed with an assault rifle some hours before the shooting is relevant to prove defendant’s preparation or plan to commit the crime and his identity as one of the shooters. In addition, any error in admitting this testimony was harmless because the jury’s verdict is not attributable to the error, based upon the ample additional evidence of the defendant’s guilt presented at trial. Thus, this assignment of error lacks | ^merit.
CONCLUSION
For the foregoing reasons, the defendant’s conviction and sentence are affirmed.
AFFIRMED.

. For confidentiality, the initials of the victim have been used. LSA-R.S. 46:1844(W).